# IN THE COURT OF APPEALS OF IOWA

No. 24-0279
Filed October 30, 2024

IN RE THE MARRIAGE OF MELISSA LYNN DECKER HURM
AND PETER MATTHEW HURM

Upon the Petition of
MELISSA LYNN DECKER HURM,
     Petitioner-Appellant,

And Concerning
PETER MATTHEW HURM,
     Respondent-Appellee.
_____

     Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

     Melissa Lynn Decker Hurm appeals the physical-care and economic provisions of the decree dissolving her marriage to Peter Matthew Hurm. **AFFIRMED.**

     Matthew L. Noel of Noel Law Office, Dubuque, for appellant.

     Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P., Dubuque, for appellee.

     Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**CHICCHELLY, Judge.**

Melissa Lynn Decker Hurm appeals the physical-care and economic provisions of the decree dissolving her marriage to Peter Matthew Hurm. Upon our de novo review, we affirm.

## I.    *Background Facts and Proceedings.*

Melissa and Peter were married June 10, 2006. They share three boys, W.H., born in 2007; R.H., born in 2009; and F.H., born in 2012; and one girl, W.M.H., born in 2013.

Before their marriage, Melissa purchased her maternal grandmother's house using funds given to her by her mother.[1] Melissa initially lived there alone, but after they were married, the couple lived there together for approximately eight years. In 2013, Melissa and Peter did a "house swap" with Melissa's father, where Melissa and Peter purchased Melissa's childhood home and Melissa's father purchased the Oregon Street house. Her father gifted $12,000 towards the down payment on Melissa's childhood home, and the couple discounted the same amount off the Oregon Street house purchase price. Melissa and Peter continued to live in Melissa's childhood home until their separation.

During the marriage, Peter worked full-time as a tradesman, and Melissa worked part-time as a cosmetologist and provided childcare. While Peter made around $65,000 annually, this was never enough to make ends meet. Both Melissa and Peter testified to suffering financial difficulties throughout their marriage and struggling to pay expenses. Melissa's father frequently provided

---

[1] We refer to this property as the "Oregon Street house" for clarity.

financial assistance to keep them afloat. However, by the time of trial, the mortgage on the marital home was in default and many bills were left unpaid.

Throughout the marriage, Melissa has had a ten-year struggle with alcoholism. She was committed twice for substance use, once in June 2020 and again in September 2022. In 2020, she pled guilty to operating while intoxicated after driving with a blood alcohol content of .310. She hid alcohol around the home in "[t]he kids' hamper, pots and pans drawer, behind the piano, behind the bed, behind the couch, closets" and replaced the medications in pill bottles with alcohol. These behaviors were not lost on the children who stated that Melissa was intoxicated "about every night" and "sometimes we'd find [alcohol] around the house." By age eleven or twelve, R.H. witnessed his mother "stumbling and not really knowing what she's doing" and recognized it as her drinking.

On September 19, 2022, Peter petitioned for relief from domestic abuse, alleging that Melissa became violent and unsafe when she drank. On September 23, Melissa slapped Peter in front of their youngest child, W.M.H. Melissa's blood alcohol level that night was .284. The State charged her with domestic abuse assault and child endangerment, and a no contact order was issued. This order prevented Melissa from returning home, so she moved half a mile away into the Oregon Street house with her father. Melissa pled guilty to the domestic abuse assault; the court accepted her plea and dismissed the child-endangerment charge. Melissa later admitted she violated the conditions of the no contact order by returning to the home, and at the time of trial, still had not served her imposed jail sentence.

By late January 2023, Melissa petitioned for dissolution requesting legal custody and physical care of all children, spousal support, child support, and equitable property distribution. After a hearing on temporary matters, the court placed the children in Peter's physical care and provided Melissa with visitation, basing its decision primarily on Melissa's unresolved substance use.

Trial occurred October 19 and 20, 2023. Melissa testified she had maintained sobriety for over a year since her committal and was "more emotionally stable to handle [the children's] needs." She also alleged that Peter was physically abusive, had similar substance-use concerns, and withheld medical care from the children. But Peter also testified, denying all of Melissa's allegations and providing a conflicting narrative. He alleged that Melissa was "sick" and questioned her claims of sobriety given she now lived with her father, who is also an alcoholic. Peter also described the children as thriving in his care and having all their needs met. Several of Peter's family members corroborated this testimony, applauding his parenting as "wonderful," a "[t]errific dad," and "doing a great job." They contrasted this with Melissa, who they described as "bitter" and manipulative, "sending these emotionally terrible messages to [the children] to make them feel bad that they're with their dad." At times, the children became so distressed by the calls that they started crying. The witnesses further doubted Melissa's claimed sobriety and her ability to care for the children based on her past history of using and hiding alcohol, becoming "physically aggressive,", and "fall[ing] off the chair forward right onto her face" because she was "that drunk." The court also consulted the two oldest children, W.H. and R.H. Both confirmed their parents' frequent arguments and Melissa's history of substance use. When asked about

the two households, neither expressed any obvious concerns or preferences. The court found "that the children love both parents and don't want to hurt either parent."

Just two weeks after trial on November 1, 2023, Melissa relapsed. By November 27, she was arrested again for operating while intoxicated after a minor traffic accident. Peter moved to reopen the record, which the court granted.[2] At the hearing, Melissa admitted to relapsing twice but claimed she had learned from the experience. But she also acknowledged she did not return to treatment or Alcoholics Anonymous (AA) after her relapses, and she could not even remember what step she was on in AA. She also failed to recognize her father's substance-use concerns, stating "he rarely drinks" despite conflicting evidence. The court found Melissa's claimed sobriety "very difficult to believe" and expressed concerns about Melissa's ability to appreciate the seriousness of her actions.

After the hearing, the court dissolved the parties' marriage, placed the children in Peter's physical care with visitation for Melissa, and imputed income to Melissa for child support purposes. It also distributed the parties' marital property, awarding Melissa the marital home but providing a $94,919 equalization payment to Peter.[3] Melissa appeals.

---

[2] Melissa did later file a resistance, but this did not occur until after Peter's motion had already been granted.

[3] The court gave Melissa a deadline of 120 days in which to refinance the home and pay Peter the equalization payment. Neither occurred during the pendency of this appeal, so the parties stipulated to occupancy of the property and an extended deadline. The court accepted this stipulation.

## II.      Review.

Because dissolution proceedings are tried in equity, our review is de novo. *In re Marriage of Stenzel*, 908 N.W.2d 524, 531 (Iowa Ct. App. 2018).  "We give weight to the fact findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them."  *Id.*

## III.     Discussion.

Melissa challenges both the physical-care and economic provisions of the dissolution decree.  We consider each of her arguments in turn.

*A. Physical Care.*

Melissa first contends the court should have placed the children in her physical care or, in the alternative, shared physical care between the parties.  She contends that she "was better equipped to meet the needs of the children" based on her history as primary caregiver and her ability to effectively parent the children despite her substance use.  She also alleges that the children should not be placed with Peter because he is unable to support a relationship between her and the children.  In determining physical care, our primary consideration is always the best interests of the children.  *In re Marriage of Hansen*, 733 N.W.2d 683, 695–96 (Iowa 2007).  We strive "to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity."  *Id.* at 695.  The district court found that joint physical care was not in the children's best interests, and we agree.

First, while Melissa's "historic pattern of caregiving" would generally work in her favor, we cannot overlook her substance-use issues.  *See id.* at 697 ("[I]f a primary caregiver has . . . not been adequately performing his or her

responsibilities because of alcohol or substance abuse, there may be a strong case for changing the physical care relationship."). We further note "the quality of the parent-child relationship is not always determined by hours spent together or solely upon past experience." *Id.* Since the parties' separation, Peter has served as the primary caregiver. Several witnesses confirmed he was meeting the children's needs and shared a loving bond with them. The court found that Peter was "the more stable parent" and was "confident in his parenting abilities." Because the court is able to interact with the parties in person, it "is in the best position" to assess their credibility. *In re Marriage of Daugherty*, No. 23-0443, 2023 WL 8071044, at *3 (Iowa Ct. App. Nov. 21, 2023) (citation omitted). We therefore defer to its findings. *Id.*

Second, despite Melissa's claims otherwise, the district court found that when she is drinking, Melissa "is simply unable to care for the children." We agree. A history of substance use does not always lead to the same result. *Compare In re Marriage of Knecht*, No. 10-0240, 2010 WL 3894449, at *4 (finding the father's accountability for his drinking, steady employment, and fulfilment of parenting responsibilities supports finding a shared physical-care arrangement), *with Kaspar v. Biermann*, No. 21-0123, 2022 WL 1100244, at *4 (Iowa Ct. App. Apr. 13, 2022) (finding the mother's "substance issues and poor decisionmaking" did not support a shared physical-care arrangement despite the her history of caregiving), *and In re Marriage of Harris*, 499 N.W.2d 329, 332 (Iowa Ct. App. 1993) (finding the mother's "alcohol problems, her disregard for the law, and her lack of economic stability" supports placing the child with the father). But Melissa's ten-year history of substance use has impacted her ability to care for the children. Her drinking

has resulted in multiple civil commitments and criminal issues. Witnesses testified to her inability to sit upright or even make eye contact while intoxicated, let alone provide care for minor children. We also cannot ignore the serious impact her drinking has on the children because it results in bouts of physical aggression. *See Hansen*, 733 N.W.2d at 698 (finding domestic-violence allegations "should be given considerable weight in determining" physical care); *see also In re Marriage of Daniels*, 568 N.W.2d 51, 55 (Iowa Ct. App. 1997) (finding domestic violence is "dramatically opposed to a child's best interests."). While Melissa claimed sobriety at the most recent hearing, the court did not find her testimony on this subject credible, especially in light of her recent arrest. Instead, it found Melissa "has not been truthful about her sobriety and is not ready to remain sober." Even when the court's credibility findings concern a party's own substance use, we defer to them. *See In re Meyer*, No. 14-0815, 2014 WL 6682321, at *2 (Iowa Ct. App. Nov. 26, 2014). Accordingly, we cannot find that a shared-physical-care arrangement is in the best interests of the children.

Finally, Melissa contends that Peter is unable to support the children's relationship with her, so he should not have physical care. *See* Iowa Code § 598.41(5)(b) (2023) (requiring the custodial parent to "support the other parent's relationship with the child"). She claims that "[i]t is obvious" that Peter "is using the children as pawns against Melissa to not only attempt to damage their relationships, but to hurt Melissa." We disagree. While the court expressed its concerns about Peter's "ability to communicate effectively with Melissa and to support her relationship with the children," it did not find this sufficient to prevent him having physical care. We do expect some level of "usual acrimony that

accompanies a divorce." *In re Marriage of Gensley*, 777 N.W.2d 705, 715 (Iowa Ct. App. 2009) (citation omitted). Peter testified this would improve substantially after litigation is over, and the children had already noticed "less arguments and fights" since the separation. Further, we are not convinced that Melissa would do any better at fostering those relationships if the roles were reversed. The record is replete with Melissa's persistent communications to the children and interruptions to Peter's parenting time, many of which violated the court's order to avoid calls around bedtime. The record also supports their negative impact on the children, who become visibly upset after these communications. We therefore find that Peter is still in the better position to foster the relationship between Melissa and the children.

### B. Property Distribution.

Melissa next argues that the property distribution was inequitable because it included gifted property that should have been set aside. *See* Iowa Code § 598.21(5)–(6) (expressly excluding "gifts received or expected by either party" from marital property distribution). But this issue was not preserved for our review. "[I]ssues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). While both parties presented evidence to the court on this issue, we are not convinced that the court actually ruled on it. Regarding the marital home, the court ruled generally and found that while "Melissa claims to have some premarital interest," it did "not find it equitable to set aside any claimed premarital interest for [her]." Premarital interests and gifted property are not the same for the purposes of distribution. *In re Marriage of Hargrafen*, No. 22-0238, 2022 WL 3421329, at *6

(Iowa Ct. App. Aug. 17, 2022) (distinguishing premarital property from gifted and inherited property). The court did not make any specific findings regarding the alleged gifted property; in fact, it did not even reference it at all. While Melissa moved under rule 1.904(2) on other issues, she did not include the court's failure to address *this* issue. *See* Iowa R. Civ. P. 1.904(2) (permitting a party to move for reconsideration post-ruling); *In re Marriage of Okland*, 699 N.W.2d 260, 266 (Iowa 2005) (finding such motion preserves error even in the absence of a written ruling on the issue). Without either a ruling or post-trial motion, we cannot find that error was preserved and therefore do not need to reach its merits. *Meier*, 641 N.W.2d at 537, 539.

Notwithstanding error-preservation principles, we do not find it equitable to set aside one-third of the equalization payment as Melissa requests. While Melissa's parents testified that gifted funds were for Melissa, the record supports the more likely theory that this "was intended to inure to the family, not to [her] alone." *See In re Marriage of McDermott*, 827 N.W.2d 671, 680 (Iowa 2013). Melissa's father gave $12,000 for the sole purpose of a downpayment on a home where the family could live.

And even if part or all of the marital home was a "gift," we still find including it in the distribution is appropriate. While we generally do not distribute gifted property, *see* Iowa Code § 598.21(5), there is an exception when the court finds "that refusal to divide the property is inequitable to the other party or to the children of the marriage," *id.* § 598.21(6). To determine whether the exclusion is inequitable, we consider the length of the marriage and:

> (1) contributions of the parties toward the property, its care, preservation, or improvement;
>
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
>
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
>
> (4) any special needs of either party;
>
> (5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*Hargrafen*, 2022 WL 3421329, at *6 (citation omitted). At the time of separation, the parties had been married for over sixteen years, which favors including the gift in the property distribution. *In re Marriage of Goodwin*, 606 N.W.2d 315, 319–20 (Iowa 2000). Peter, without dispute, served as the primary breadwinner during the marriage and paid the bulk of the expenses on the property. Melissa's father also testified to his close relationship with Peter, one that was independent of Melissa and occurred outside her presence. We also express concern for the children who need stable housing, and which Peter, despite his earnings, cannot afford without funds for a downpayment. "We will not disturb the district court's ruling unless it fails to do equity." *Hargrafen*, 2022 WL 3421329, at *5. Under these circumstances, we cannot find that excluding one-third of the marital home from distribution would do such equity.

*C. Imputed Income.*

Melissa then challenges the court's imputation of income to calculate her child-support obligations.[4] *See* Iowa Ct. R. 9.11(4) (permitting the court to impute

---

[4] While Melissa does not address this in her appeal, we note that the court failed "to make the requisite determination that if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs

income upon a finding "that a parent is voluntarily unemployed or underemployed without just cause"). Melissa's previous earnings have historically been as low as $3000 annually as she worked only part-time and provided childcare.[5] But the court found her earning capacity closer to $36,000 annually. While Melissa concedes her unemployment is voluntary, she argues the imputed income is inequitable because she needs "time to work through addiction," which prevents her from working full-time.

Upon our own review of the record, we find that Melissa's imputed income is "within the permissible range of the evidence." *In re Marriage of Godbolt*, No. 22-1550, 2023 WL 4759454, at *5 (Iowa Ct. App. July 26, 2023). Melissa testified at trial that she "can pretty much learn anything" and is currently employable. She also has an active cosmetology license, has low operating expenses at only $800 annually, and is able to work at her mother's salon without paying a chair rental fee. But by the time of trial, Melissa had not applied for any jobs and admitted she did not intend to until the dissolution proceedings "get settled." Instead, she worked *less* now than she did during the marriage. And while we acknowledge the time needed for cosmetologists to build up clientele, *see In re Marriage of Rogers*, No. 16-1571, 2017 WL 4842306, at *6 (Iowa Ct. App. Oct. 25, 2017), Melissa has not made any efforts to do so. Melissa testified she only goes in once per week to service walk-in appointments and build a new client

---

of the children." *In re Marriage of Lindemier*, No. 14-1321, 2015 WL 2089702, at *6 (Iowa Ct. App. May 6, 2015); *see also* Iowa Ct. R. 9.5(1)(d) (permitting the court to impute income pursuant to "a written determination"). But we can make this finding upon our de novo review. *See Lindemier*, 2015 WL 2089702, at *6.

[5] Melissa has actually made even less than $3000, but this was during 2020 in the midst of a global pandemic.

base. Even with her limited working hours, she testified she expected to make approximately $10,000 this year but "didn't have enough time" to present evidence of this to the court. Conversely, Peter testified she was capable of earning approximately $34,000 annually. The court found Peter far more credible, stating Melissa "has the ability to earn substantially more than she has in recent years." We defer to such "strong credibility determinations" regarding income that is variable by nature. *In re Marriage of Peck*, No. 23-0791, 2024 WL 105557, at *5 (Iowa Ct. App. Jan. 10, 2024). "We also note she no longer has the responsibilities for physical care of the children," which allows her the time and flexibility to work full-time hours. *See Lindemeier*, 2015 WL 2089702, at *6. While Melissa already has everything at her disposal to maintain employment, we find she has not taken advantage of such opportunities; accordingly, using Melissa's actual earnings rather than imputing income would result in "substantial injustice." *See id.*

D. *Appellate Attorney Fees.*

Finally, Peter asks us to award him appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *Stenzel*, 908 N.W.2d at 538 (citation omitted). In exercising this discretion, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted). While Peter has had to defend this action, we decline to award either party appellate attorney fees.

*IV.* *Disposition.*

Because it is in the best interests of the children to be placed in Peter's physical care and because the property distribution and income imputation are equitable, we affirm. We also decline to award appellate attorney fees.

**AFFIRMED.**